When you're ready. Good morning, Your Honors. My name is Rex Smith. I represent Jason Stone. May it please the Court and Counsel, the first issue that came across to me when I reread the briefs the last couple of days was going back to the very beginning of this case 13 or 14 years ago. The theory of the case that I presented was that Mr. Stone, as a young man, a very young man, with a high IQ, couldn't work because as a result of pain and fatigue he was relegated to what one of the vocational experts called every man jobs, surveillance screen monitor, laundry sorter, jobs that if you can just show up, then you can work. And throughout all of the hearings before ALJs, I think there were at least three vocational experts called by the ALJs, all of whom indicated that for those every man jobs, a person really couldn't miss more on average than one work shift a month. And the reason for that is that the demand for those jobs is quite high, so if you're an employer, you have a lot of latitude to only keep people in the payroll who can show up regularly. But the overarching theme throughout the last 13 or 14 years is if you take a man who was born in 1974, who's got a high IQ and who is continuing he can't work because of pain and fatigue, intuitively that's difficult to want to reach that result if you're a decision maker. The thought would be that this is a young fellow who ought to have his whole future in front of him, who in a way ought to have the world by the tail. He's got youth, he's got a good mind in the sense of a high IQ, so when as a decision maker you hear from a treating physician, and I've set out the treating physicians. Well, I'm sympathetic to what you're saying, but I don't know that it's really a discussion of the record. The fact of the matter is that people who go in for social security disability claims, they all have a problem of one kind or another. And to suggest that the ALJ simply isn't sympathetic to this kind of problem because the person's bright and seemingly can work, I don't know. I don't know that there's evidence in the record saying, showing, demonstrating the ALJ is not sympathetic to the problem. I think what happened here was a number of doctors testified and the ALJ came to certain conclusions. And so really what you have to attack, you're halfway through your argument, you have to attack why is the record wrong? Why would the record compel a different result? And I don't think the way to approach it is to say, well, people just aren't sympathetic to this claim. Well, I get mixed up between cases in the state of Oregon having to do with when an expert is qualified, and I do almost nothing in federal court. So if I'm referring to Dauber, is that one of the blockbuster federal cases? It may be dealing with- It was a blockbuster. No, I don't know that it apparently has reached this level. So I guess the analogy here is that the last ALJ who heard this case, what he had was you go back to the first treating physician licensed by the Board of Medical Examiners in the state was a Dr. Jewel Crawford. And that was the first doctor who, in conjunction with getting a consult from a rheumatologist, made the diagnosis of fibromyalgia and started this young man with taking a lot of pain medicine. And then the record reflects that Dr. Crawford relocated out of state. And that's when Dr. Redfern, an osteopath, again licensed by the Board of Medical Examiners in the state of Oregon, became the treating physician. And Dr. Crawford, as an osteopath, continued the same treatment regimen. Then in the hearing in about 2000, the government arranged for Dr. Cohen, an orthopedist, and in his resume, which is in the record, Dr. Cohen had practiced as an orthopedist for 50 years. Here's my problem with this case. The medical things in the record seem to show, at least the ALJ thought they showed, and it seems to me there's a fair amount of evidence to support this finding, that physically there's not a lot wrong with this young man. That to the degree that there are problems that might prevent him from work, they seem to be more psychological than physical. And then we're trying to figure out, I mean, my problem with all of these cases, not confined to this one is, if we've got someone who is, and this is not your client, severely schizophrenic, that is to say, his body is just fine, but his mind has terrible trouble, that person is going to be disabled. What do you do with someone who is not, I mean, severely schizophrenic, not severely bipolar, but nonetheless we've got psychological problems that appear to kind of jump out at us from the face of the record. We've got evidence in here from which the ALJ said, you know, this psychological impairment or tendency, or whatever we're going to call it, doesn't rise to the level where he simply can't control it. What are we supposed to do with that? Well, again, you go back to the 2000 hearing, and you've got Dr. Cohen as the orthopedist, and he says, you know, I've never even heard of fibromyalgia for most of my practice, but, you know, I've listened to the claimant's testimony and his other witnesses, and I agree that that's here. But there was another witness who testified at the same time, and that was a psychologist. So the judge asked the psychologist, after Dr. Cohen testified, said, you know, what's your perspective on this? The psychologist said, this is the mental side of the mind-body component. We don't clearly understand what's going on here. Let me give the best analogy that I can, and I'm not a doctor. I'm in a medical school, but based on what the doctors are indicating, when we're healthy, we get circadian rhythms that work for us. If we're coming down with bad flu, we all know how everything gets out of whack. As best as I can see what is going on here, this is just looking at what these doctors have said. You've got a young fellow, and he gets up to about 16 or 17, and for biologically-based reasons, internally, something goes wrong. It's not clearly understood, but it's got a physical end to it and a psychological end to it. And for this young man, everything's out of whack. Sometimes he's on an even keel. Other times, day is night, night is day. At times, he's up days in a row. Other times, he's sleeping days in a row. That's what we're getting out of here. That's his theme of the case. It's why he can't work, because he's not going to be able to keep any set work schedule. I've got 30 seconds. Judge, if you'd allow me to have a minute for rebuttal, I'd appreciate it. Why don't you take your seat? We'll have him on the other side, and we'll give you a chance to respond. Good morning, Your Honors. David Johnson, representing the Commissioner of Social Security, Michael Astru. Mr. Stone had fibromyalgia. Mr. Stone had psychological problems as well. His fibromyalgia and his psychological problems were severe, and the ALJ weighed all of the evidence to figure out what substantial evidence showed were his work-related limitations. The reliably evidenced limitations were accommodated in the residual functional capacity finding. Because that was supported by substantial evidence, it should be affirmed. Now, when Dr. Patrick, who the ALJ relied on, examined Mr. Stone, he also looked at the record evidence and his opinion, as well as his observations during the examination. Dr. Patrick's opinion was consistent with other physicians in the record, psychologists and medical doctors as well. And because of the psychological component, Dr. Patrick was the appropriate person, in addition to Dr. Redfern, to evaluate the plaintiff's limitations. Dr. Redfern reflects a treatment history for Mr. Stone that evolved to an understanding that most of his limitations were psychologically based and not physical, not patho-anatomical, as Dr. Redfern referred to them. So Dr. Patrick and Dr. Redfern's opinions can be read in concert. And as Dr. Cohan testified, Mr. Stone's fibromyalgia is best evaluated under listing 12.07, which is somatoform disorder. When we get to that point, then the question becomes relevant of Mr. Stone's credibility. As Dr. Patrick found after extensive review and his own personal observations of inconsistencies, there were ample sources that Mr. Stone's self-report was not consistent with his demonstrated behaviors. To the extent that Mr. Stone had limitations that he could not control because they were caused by psychological factors in his fibromyalgia, they were accommodated in the residual functional capacity finding. To the extent the limitations were claimed but were not evidenced reliably, they were not accommodated, nor should they be. Bayless and Ossenbrock tell us both of those things, each tell us that thing. Bayless also, I believe, is the case that stated that Daubert's inapplicable. And as far as Mr. Stone's argument that it's difficult to find him or someone in his situation disabled, there is a presumption that ALJs are unbiased, that has not been overcome, the ALJ's decision should be affirmed. Thank you. Thank you. Would you like a minute for response? Let me have a minute, Your Honor. Please. Dr. Patrick was a psychologist, so just going through Jewel Crawford, MD, Dr. Redfern, licensed osteopath who can prescribe medication, and what the ALJ did was as a layperson, as an ALJ, combined whatever a layperson can do along with Dr. Patrick and said that Dr. Patrick, in the ALJ's view, trumps many years of what a treating physician had to say. That's the analogy that the claimant's making with the Daubert situation. I don't think that's what he's doing, counsel. He's addressing the record evidence, which is what you do in a Social Security case. You're asking a three-judge panel of appellate judges to second-guess and substitute their wisdom for the ALJ. And we have to go by what the ALJ did, and we look at the record, we look at the medical records. Dr. Redfern's analysis was considered and, to a large extent, looked at by and considered by the ALJ. And as counsel just said, there was a strong, by your own description, strong psychological component to this. So I'm left without anything on which to say that the ALJ did something wrong here. What's to say because he somehow is a layperson and to say he sort of combined them, that doesn't help me. Well, let me specifically respond to Your Honor's question by making the following comments. The ALJ was of the view that Mr. Stone is a medication drug addict because Dr. Redfern had made Mr. Stone a medication drug addict. Dr. Redfern, because he's licensed by the Board of Medical Examiners to prescribe narcotics, treated Mr. Stone for pain using large quantities of narcotic pain medicine over an extended period of time. The question before Your Honor is, was it fair for the ALJ, after I made repeated requests to ALJ Teelans, Judge, would you please have a medical doctor at the hearing so that you can hear the testimony about why Dr. Redfern, on the physical side of things, prescribed all of this narcotic pain medicine over all of these years. And ALJ Teelans repeatedly turned me down and the referral that he made was to a psychologist. So, Judge, if there's any possibility you're going to take another look at this, that's what Mr. Stone is asking this appellate panel, as an appellate panel, to take a look at and simply let me know, let Mr. Stone know, after 14 years, repeated hearings, nobody ever willing to finally address the theory of his case, has this been a fair proceeding. If Your Honor's reached the point that it hasn't been a fair proceeding, then maybe go the next step, and rather than remanding, where we're going to be at it for another four or five years, if the panel concludes that it hasn't been fair, then take a look at whether you see enough here to bring the case to a favorable conclusion to the claimant after all these years. Thank you very much. I really have run over my time. Thank you. The case of Jason Stone versus Astro is submitted for decision. The next case on the argument calendar is Roe versus Educational Credit.
judges: Fletcher, Fisher, Breyer